Good morning, Justice Okutu, McCowan, and Pratt. It's Judge. We always say no justice at the Ninth Circuit. It's a funny thing in California, unlike some states where we're called judges all through the federal court, but the State Court of Appeal, as you probably know from arguing over there, they're called justices. We like that, so I'll accept it. Thank you. My name is Marshall Hahn, and I'll be arguing on behalf of the appellant, Kevin Wessell, and Matt Hesse. And just in terms of your rebuttal time, you have a clock there, and that's your total time. I do. Okay. And if I may save any unused time for rebuttal, I'd appreciate it. All right. First, I'll mention who are not defendants here. ALPS is not a defendant, and 1-800-COMPANY is not a defendant. I've gone through the elements, and I'm just going to highlight what I have in the brief. I've gone through the elements of intentional misrepresentation, concealment, and negligent misrepresentation, which are based upon the CACI notations. What we don't have against Wessell and we don't have against Hesse is an intentional misrepresentation. What we have is Sweden is safe and Sweden is this and Sweden is that, opinions that are based upon what they say is they learned, they believed. It's opinions. It's sales talk. It's opinions. What we don't have is does Hesse or Wessell pressure Alexander to put his money into ALPS? We do not. Do we have an intentional misrepresentation, a knowing intentional misrepresentation by Wessell or Hesse? We do not. That Hesse knew was false, that Wessel knew was false? We do not. So they point to statements about how Sweden has a superior banking system, their money would be safe, their money would be liquid, and they omitted any statements about the fact that it was a credit union and was essentially unregulated, that it didn't have a presence in Sweden and essentially did all of its investments in Washington State. So they point to those statements as being completely discrepant with the representations that were given to Alexander. What's the response to that? The response to that is, one, the website that existed answered all of these questions. It said we invest in real estate. It said we are unregulated. We're not like a credit union in the USA. And, unfortunately, Wessel wasn't asked. He has a license, and it was filed in Sweden. Doesn't that really go more to justifiable reliance? In other words, there's the court found that there was justifiable reliance on Alexander's part, even though, as your briefs point out, he didn't do any further investigation about the website. But I don't see how that goes to whether the representations or omissions that were provided by Wessel and Mitchell were not misrepresentations. First, we need a misrepresentation, and we also need reliance. So I think the reliance goes to more to the two. It overlays all three causes of action, four causes of action. So we'd have to say that the district court clearly erred because it's a question of fact as to whether the reliance was justifiable or not. So what would be the basis for saying it smelled like a rotten fish? Isn't that what our standard is, something along those lines? Yes. I know the thing that the justice is referring to. And what I think happened is, with all due respect, Judge Fischer didn't like my clients, didn't like what they did. Whether they are savory or unsavory is not the test. The test of intentional misrepresentation, concealment and negligent misrepresentation, RICO and alter ego, and the punitive damages, which I haven't gotten to. Let me ask another related question on your point on intentional misrepresentation, because the Court made alternative findings, either that these are facts and not puffery and mere opinion, but if they weren't, then alternatively the superior knowledge prong could hold them liable. And it seems to me that the findings, we'd have to see where did the Court err on superior knowledge conclusions. Maybe you can point me to something specific in the findings, the district court's findings of fact on that. I think with all due respect, Her Honor, in the district court, put the burden on the defendant to prove or not, as opposed to put the burden on the plaintiff to prove you are. And I believe where Her Honor erred, aside from the fact that there is a disconnect in the negligent misrepresentation, he argues, the plaintiff argues, we didn't prevail on that, yet the judgment signed by Her Honor. Well, that doesn't actually get to the point. Here's what she said. She said, well, even if these statements were not about keeping the money in Sweden and safe, et cetera, were not fact, as opposed to opinion, said they claim to be experts in the field of asset protection, including recommending where clients should place their fund, that represent themselves as having superior knowledge of the facts, and to have made the same recommendations, and performed the same function for many clients. So alternatively, the court found that the intentional misrepresentation and related claims were supported by the superior knowledge principle. In terms of what I just read, which are factual findings, where is the error? I think Her Honor's error is in the following. To say a dog is a dog doesn't make it a dog. If you don't want to, does it scratch, does it bark? So as Mr. Alexander, in many places in the transcript, he placed complete reliance upon what he was told. He didn't look. He didn't want to. She didn't say it's a dog, but in fact, you looked over and everyone who knew it was a cat. She said, I looked at all of this, and I didn't see a cat. I saw a dog scratching, and here's the things I saw him scratching. So that's what she said. She recited what she saw. I agree. Or what she heard. She has to make a factual and credibility determination, right? Correct. And I notice in one of the facts she says, and this is based upon my observation. Well, that's what her job is. She's hearing the case. And so did Her Honor protect herself? And is there facts in the record? That is what the justices are going to have to decide. Either the trial court said, well, I think it's a dog, and say, well, you thought wrong, and we don't agree it's a dog. And that's what your justices are going to have to say. Rather than talking about dogs and things, could you tell me specifically what the factual error was that wasn't supported by the record? I mean, she identifies, Ms. Representations, she, in her view, the reliance was justified. I mean, to me, those seem like two different issues. But what specifically is the factual error? I think the errors consist of the following. One is Alexander says no negligent misrepresentation. She signed a judgment once. Okay. That's a legal conclusion, right? So, for example, didn't there was testimony that Mitchell, I guess, that he was an asset protection specialist, but the record showed that he had no particular training or experience or knowledge. Isn't that supported by the record? I don't know how many years you have to be considered an expert. Wessel's testimony and Hesse's testimony. I've been doing this and doing this and doing this. Is it one year? Is it two years? Is it three years you become an expert? If that's all you do, then you're an expert. And that's why people listen to people who say, look, this is what I do. I'm in the asset protection people. I tell people where to place their funds. And the client says, well, that's good because I want somebody who's been doing this, who is an expert, who's been telling clients where to place their funds, plus you're just telling me, not you, but the client is basically making those representations. So it's not only the representation, but it's the impact of the representation on the investor as well. I still am having some trouble, as I think Judge Ikuda is, is figuring out, well, is there something that's not supported by the evidence? And is there something that's clearly erroneous in the fact findings? There's a lot of findings here, I admit. But that was an effort to try to document everything. I think the findings on punitive damages was one. So now we've jumped. Let's go to punitive damages then. All right. And what Her Honor said, Vacciano and Tangi Tupwala and Alexander put in $6.6 approximately million. And we're not going to inquire about Kevin Russell's wealth or his financial ability to absorb it. We're just going to start and stop there. Even though there was testimony about Mr. Tupwala was repaid $3 million. He was repaid a note, $1.8. That brings it down to less than $1.6. But the punitive damages against Mr. Russell were $2 million. What you're saying is that even though she said something to the effect of, well, I've looked at everything, and I think they have the ability. Your suggestion, she needed to have more documentation or more texture in her ruling on that point. Proof. Right. Those pesky little proof facts. Okay. Let me ask you this. Yes. Let's just assume that we were to agree with you on the punitive damages and reverse because this element of financial ability to pay is missing. It's an unusual thing here. We're at the end of the trial. Basically, Alexander got a choice on RICO versus punitive damages. Correct. In your view, if the case were to go back to the district court, would that choice be on the table again or would she need to recalculate the punitive damages? What would happen as a practical matter? I think as a practical matter, a plaintiff has made their choice and they're going to live and die by their choice. Okay. So they were offered the choice, punitives or the triple damages, and they chose punitives. So if punitive is reversed, then they live and die by their choice. By a revised punitive damages calculation, which could either be the same or different. Correct. All right. But the judgment's been vacated, hasn't it? The district court judgment's been vacated by the Court of Appeals. Don't we have to have a retrial on the damage issue? Or proof. If this Court feels you haven't crossed over the threshold and you haven't crossed the bar to award punitive damages, that portion, if not all of it, we're going to reverse. So you want to say that part of the judgment's vacated, but the other part's not? Is that your point? I think it's different reasons why the judge, whether it be lack of elements, whether it be reasonable reliance, whether it be I didn't look at the webpage until my brother, after I'd sent the money, had pointed out to me. Let me interrupt. The premise of Judge McEwen's question was what happens on retrial, not back to justifiable reliance. The judgment's set aside because the trial court erroneously did not go into the financial condition of the defendant. You say it goes back only for determination of punitive damages and that the RICO 3 times 528 can't stand. Is that your position? My position is that there is insufficient facts on me to support the findings, and there's insufficient facts of the alter ego liability, and there's insufficient facts of the punitive damages. So whether the justices feel we're going to reverse and start from square one, fine. I understand that. All right. You've used your time. We'll hear from Alexander's counsel. Thank you, Your Honors. Edward Bilak for Plaintiff and Appellee, Tom Alexander. Your Honors, we know what the case is about. In 2008, my client had $524,000-plus. He wasn't looking for an investment. He was looking for a safe place to put the funds that would be accessible whenever he needed it. He relied upon the guidance, the purported credibility and expertise of these defendants, these appellants, to guide him and tell him where the safe place to put his money was. That was this so-called Swedish credit union, the Alps. What he didn't know is what the facts that were found by the court in this case are. The misrepresentations, the concealments, and the evasions. I find myself in an unusual posture in light of the last few comments of the court with respect to the punitive damages. I'm kind of urging the court not to intervene with the award of punitive damages, number one, because it is factually based. The court did take a look at all the unpaid amounts out there, and whatever basis the counsel has for asserting that there were settlements made with Mr. or Dr. Topoala, the fact is there's millions of dollars, the judge found, that was unaccounted for, and that money was in the possession of the defendants. Where does it say that? I mean, it says, I looked at all this stuff, and then there was the collected. I'm trying to figure out, do we have any sense of what is the net worth? What are the liabilities? I don't know if there's any liabilities. Well, I don't know either. Well, that's one of the problems. I understand that. The amount of the award of punitive damages is not out of line with the civil penalties, which were $1.6 million. I don't think the way I read the appeal, it's not, you know, an Exxon or BMW type appeal on the relative ratio. It's a question of under California law, if you're going to make a punitive damages award, you have to benchmark that against net worth or some other factors that give you a sense of ability to pay, and so that's really the challenge. I think it's a fairly narrow challenge, and the question then is did the judge's single statement justify the ability to pay portion of the requirement? Well, I would argue that it does because, don't forget, these people were wheeling and dealing in real estate. They had lots of properties in Washington State that they owned or they were financing, and I would suggest that the court took that into consideration as well as the almost $3 million that was still unaccounted for from the three individuals who testified at trial, including my client. But to follow up on Judge Pratt's comments, if the case is reversed on that grounds, then we do have a retrial, at least on that issue. And the other option is that, and I really disagree with counsel's statements that we live or die by our election to go with the punitive damages against Mr. Wessel versus the treble damages against all of the defendants. When we made that election, we didn't know that it was an either-or until the end of time. Oh, come on. You got a choice. It's like going on the game show A or B, and you chose B. But wouldn't that really be up to the trial court to determine the scope of her ruling? Yes, and I would certainly argue if I were back in front of Judge Fischer that we will just opt for the original choice, which is we have treble damages from RICO, and we'll select that. And so I'm putting myself in the position of kind of arguing I don't want treble damages against all the defendants. I would opt for punitive damages against Mr. Wessel, but if we have to abandon that, then I will return to my original posture, which is treble damages against everyone. And if you did that, I'm not trying to encourage any appeals, but I'm just trying to understand the posture, then that would be a new judgment, at least on the punitive damages. I mean, excuse me, on the RICO damages, correct? Possibly, yes. So we're going to open up another can of worms, which is kind of a waste of judicial resources, but I know this sometimes happens. We would be going into financial issues along those lines or just suggest to the judge that she simply stick with the treble damages against everyone. The real problem the defendants have, and they've had it since the trial started, and that is that they simply weren't believed. The judge saw what happened. I submit that counsel said the judge didn't like the defendants. I suppose that's true to a certain extent because she heard their testimony. And it's a funny thing about judges. I've run into this over the years. No judge likes to be lied to, and when they get the impression they're being lied to, they tend not to like the party or the witness that's doing the lying. I caution against that for both counsel because there's not a suggestion here that the court was biased. No, absolutely not. And so whether she liked or didn't like, that's not really either on appeal or for us to factor in. Well, I just wanted to make that clear because the comment was the judge didn't like the defendants, and that's why she didn't like them. To me, the evidence was overwhelming. Based on the court's questions and the comments, I don't know how you get around the evidentiary findings this judge made. They are simply well sourced in the record, in the testimony, in the documentation, and under the clear error standard, there's simply no way that reversal would be indicated. So unless you're going to do that. Could you tell me how we square up the RICO ruling with the ruling that there was alter ego liability between Wessel and the companies? Because under RICO, there has to be a distinction between the enterprise, which the district court said was the group of corporations and the individual, the person. And if Wessel was the alter ego of the corporations, then where is the distinctness? Well, the distinctness is that Mr. Wessel was operating, was interchanging the corporations one to another, but he was operating them as distinct entities. After all, the other defendants were participating. But for Wessel to have RICO liability, he has to be distinct from the enterprise, which the Supreme Court has told us could be if you're an employee or a director. But here the court found that he was the same as the corporations. Well, but he was also a director and he was also an employee. But according to the court, he was the alter ego, so there was no distinction between the corporations and him. I mean, otherwise I don't see how her punitive damage ruling makes any sense because the information was that the money went to the corporations, not to the individuals, the information she was relying on. So these three rulings seem a little bit inconsistent. Well, in terms of making money, was Your Honor's question about them profiting from the activity? Well, if Wessel is the alter ego of the corporation, there is no distinction between them. That's what the alter ego liability doctrine says, as I understand it. So that would make sense with her punitive damage ruling because she was looking at what money the corporations might have a claim to. But it doesn't make sense for the RICO ruling where the person who has RICO liability has to be distinct from the enterprise, which in this case she found to be the corporations. Well, there's also the overall fraudulent scheme, which was implemented by these various entities and these individuals. But Mr. Wessel's position was more as the divisor of these schemes. Now, it may be that the alter ego findings are inconsistent, but I don't think the court was viewing it as— first of all, these entities are defunct and nonexistent, and I think what the court was doing was saying all these manipulations were really the result of Mr. Wessel's scheme. He was bad, but that doesn't mean that he has RICO liability, which is what I was trying to figure out. Yeah, but I disagree with Your Honor's conclusion, but I'm not sure what the judge was thinking when she found the alter ego liability other than that was the way Mr. Wessel was doing business. So is the alter ego ruling, do you believe, erroneous? Well, I think in retrospect it was probably unnecessary. We alleged it in our complaint at the outset of the case when we didn't really know who was doing what. But it's not necessary because typically that doctrine is invoked where a party is trying to shield him or herself from liability hiding behind the corporate guys. We didn't have that here, so I don't think it was a necessary finding. So which were the corporate entities that were actually parties? Not 1-800 and not the Alps? Companies Incorporated, which was doing business as Inquay, and Presidential Services. PSI. Right, and all of those ended up in bankruptcy. And I suspect that seeing the way they were all manipulated into bankruptcy that that was probably one of the motivations for the court's finding of alter ego. One company filed a week before trial, one filed the day before trial. It was Mr. Wessel putting them all in and out of bankruptcy. So how does the bankruptcy of the corporations affect the punitive damage analysis? Well, I don't think it was. I mean, wasn't the funds were in the corporations, and so they were in bankruptcy. So the financial condition of the entities that held the money was bankruptcy. Well, we don't know who held the money in those companies and what properties they had. I mean, if you look at their bankruptcy schedules, which were not part of the record, I suspect you'd find that they're declaring zero assets. And that just seems to be the way Mr. Wessel was doing his business. So the punitive award is against Wessel? That's correct. So if you are looking at net worth, you're looking at his personal net worth? Correct. Was there anything in the record about his personal net worth? No. Well, then how can you sustain under California law the punitive damages award? Well, as I suggested, the punitive damages was based upon the unaccounted-for funds that had come to Mr. Wessel's possession through one or another of these entities. Admittedly, we didn't take a financial statement from him. There wasn't evidence specifically on that line. I think the court was simply looking at the overall picture and all the properties and funds that had been unaccounted for and concluded that there was enough money there because it didn't show up in anybody's bankruptcy that that money would be available to satisfy the punitive damages. Is the rationale for California punitive damages law that you have to know how much money the defendant has in order to know how to teach him not to do this again? Is that the rationale? I think that's more or less the rationale. Okay. There is a concept of punishment, obviously, that's involved, too, that it's got to be enough to sting. And when you're looking at $1.6 million versus $2 million, nobody has to pass a financial test for treble damages to be imposed. So I don't think it's far out of whack. It looks like my time has expired. Thank you. I will submit. Thank you, Your Honor. Your time has expired. I'll give you one minute for rebuttal if you think you want it. I don't want to do it. All right. Thank you. Thank you both for your argument this morning. The case of Alexander v. Wessel is submitted.
judges: McKeown, Ikuta, Pratt